IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

CHRIS L. SALEK,

                Plaintiff,

     Vs.                            No.  11-2585-SAC

RELOAD, INC., RELOAD EXPRESS,
INC., WATCO MECHANICAL
CORP., WATCO TRANSLOADING
LLC, and PHILLIP A. PENNER,

                Defendants.

MEMORANDUM AND ORDER

        The case comes before the court on the following dispositive motions:  the plaintiff Chris Salek's motion for summary judgment (Dk. 116), the defendant Phillip Penner's motion for summary judgment (Dk. 119), and the remaining defendants' motion for summary judgment (Dk. 121). As the matters have been fully and finally briefed, the court files this order as its decision on these pending motions.

        A quick glance of the parties' extensive memoranda, the voluminous exhibits, and the numerous claims and defenses certainly leaves the impression about the complexity of the legal and factual issues here. Not only are the facts somewhat involved and layered, what the parties seek to infer and argue from them further complicates the case. This has been fully played out in how the parties briefed these summary judgment proceedings.

Instead of simply disputing and defending their statement of facts with proper citations of the summary judgment evidentiary record, the parties spent inordinate effort arguing over what inferences and conclusions to draw from the evidentiary record. Consequently, the court's work on these motions has been extended and frustrated by the repetitive presentation of arguments. For purposes of this order, the court will present its summary of the uncontroverted facts and then discuss the respective claims focusing principally on the factual disputes relevant and critical to the summary judgment rulings.

The court recognizes the delay in issuing this decision has been unusual, as have been the parties' numerous, lengthy and contentious filings, the voluminous exhibits, the evolution of the plaintiff's numerous claims, and the repeated and varied presentations of factually disputed matters. The longest, and most recent, delay is attributable to expansive discovery produced by some of the defendants in response to a discovery order entered approximately one year ago. Because of the size of the additional discovery and the anticipation that the parties may find some evidence relevant to the summary judgment proceedings which would need to be incorporated by supplementary briefing, the court suspended its work on these motions and turned its attention to other matters. In the meantime, the parties appear to have processed the recent discovery materials, as capably guided by the magistrate judge, and have filed their

supplementary pleadings as permitted by the district court. With the motions

now ready for decision, the court has returned to these motions as permitted

by its schedule.

**SUMMARY JUDGMENT STANDARDS**

Rule 56 authorizes a court to "grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it would affect the outcome of a claim or defense under

the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). "[T]he dispute about a material fact is 'genuine,' . . ., if the evidence

is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.*

On summary judgment, the initial burden is with the movant to

point out the portions of the record which show that the movant is entitled

to judgment as a matter of law. *Thomas v. Wichita Coca–Cola Bottling Co.*,

968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied*, 506 U.S. 1013 (1992).

Instead of disproving a claim or defense, the movant need only show "a lack

of evidence" on an essential element. *Adler v. Wal–Mart Stores, Inc.*, 144

F.3d 664, 671 (10th Cir. 1998). If the movant meets that burden, the

non-movant must come forward with specific facts based on admissible

evidence from which a rational fact finder could find in the non-movant's

favor.  *Id*.   The non-movant's "burden to respond arises only if the" movant

3

meets its initial burden of production. *Neal v. Lewis*, 414 F.3d 1244, 1248 (10th Cir. 2005) (citation omitted). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether the evidence is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. at 251–52. Put another way, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *See Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009).

In applying this standard, all inferences arising from the record must be drawn in favor of the nonmovant. *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003). The Supreme Court has made it clear that:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Anderson*, 477 U.S. at 255 (citation omitted). Thus, district courts are to tread cautiously in summary judgment proceedings. *Id*. Nevertheless, the court will expect that the party defending against summary judgment will "establish, at a minimum, 'an inference of the existence of each element essential to the case.'" *Croy v. COBE Laboratories, Inc.*, 345 F.3d 1199,

4

1201 (10th Cir.2003) (quoting *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir.1994)).

**SUMMARY STATEMENT OF FACTS**[1]

The defendants Reload, Inc. ("Reload") and its affiliate Reload Express, Inc. ("Reload Express" when referred to separately but otherwise is incorporated in the joint reference of "Reload") started as a small company in LaCrosse, Wisconsin, but grew over the next 25 years. Reload operated a rail-centric transloading business that served destination customers by transloading freight shipped by rail onto semi-truck trailers for final delivery to the customers not directly served by rail. Being a customized service, a transloading business can include handling and transporting various freight, such as, lumber, roofing products, papers, steel, auto parts, dry goods, canned goods, chemicals, petroleum, and other products. Reload's business had not expanded into transloading such hazardous materials as ethanol or crude oil. Reload also provided warehousing, inventory management, trucking, and single bill rail logistics. For the 12 years before it was sold, Reload was equally owned by the plaintiff Chris Salek and the defendant Phillip Penner.

The defendant Watco Mechanical Corp. ("Watco") is one of the wholly owned subsidiaries of Watco Companies, both of which are located in Pittsburg, Kansas. Watco and its related entities own and operate shortline

---

[1] The court intends the following to serve as a summary background of the uncontroverted facts taken from the parties' motions and the pretrial order.

railroads and provide international transportation services. Its three divisions are <u>transportation</u>--shortline railroads and industrial switching, <u>mechanical</u>--major mechanical repair facilities across the country, and <u>terminal and port services</u>--warehouses, ports and transloading facilities. In the middle of 2007, wanting to expand into transloading, Watco hired Kevin Goins who recommended Watco's acquisition of Reload.

In July of 2007, negotiations for the sale of Reload to Watco began with Salek and Penner wanting $12,000,000 or one times Reload's annual sales and with Watco wanting to pay a multiple of Reload's sustainable cash flow or EBITDA" ("Earnings Before Interest Taxes Depreciation Amortization"). A couple months later, the parties executed a non-binding letter of intent that called for a purchase price of $12,000,000 with Watco paying this price through a one-time cash payment equal to 4 times Reload's "sustainable EBITDA" and if the cash payment was less than the purchase price then the balance would be paid in common stock. Counsel for Watco sent a first draft of the stock purchase agreement ("SPA") on October 15, 2007. Because the agreement contemplated Salek and Penner keeping some equity in the company, the draft did not state a purchase price but said the parties had agreed on an "Enterprise Value" of $12,000,000 and the purchase price would be equal to the multiplied sustainable EBITDA plus the equity given to Salek and Penner.

On October 23, 2007, the plaintiff Salek sent an email to Watco's

6

CEO Rick Webb that included the following:

> We need to make sure that the growth in reloads [sic] business segment occurs in reload and not in another subsidiary that Phil and I are not shareholders in. This could be accomplished by describing our market area (transloading is the best description we could think of) and then have Watco and its subsidiaries and affiliates agree that they are not going to get in that market or service line.

(Dk. 123, Ex. L). At a meeting in Pittsburgh, Kansas, on October 26, 2007, there was discussion of this topic. The cited testimony presents a factual dispute over what CEO Webb told Salek at that time about all transloading business going under Reload. Salek testified Webb promised that all growth in the transloading business would be under Reload. Webb testified that he did not make any such representations in the context of an agreement with earn out provisions.

In an email entitled, "New deal," and dated November 29, 2007, Salek wrote Penner laying out some of the terms for selling "100% of Company," namely, "Cash price--$9,000,000" with an "Earn out--$3,000,000 over 3 years or longer based on $2,250,000 over 3 years with 1 Million cap" and a "3 year employee agreement co inside (sic) with earn out At our requested salary and benefits."  (Dk. 123, Ex. P). On December 26, 2007, Salek sent an email, "This should be it," that highlighted a closing cash payment of $7,500,000 with a commitment "to no more changes."  *Id*. at Ex. T.

Salek testified that his company when sold was worth less than a year before and that he considered the $7.5 million cash payment to be a

7

"good deal." (Dk. 123, Ex. B, pp. 49-50). Salek also testified that the

purpose of the earn-out provisions was to reach "the 12-million-dollar

purchase price" and that Watco was using the provision as its "financing."

*Id*. at p. 100.

On January 4, 2008, Chris Salek, Phillip Penner and Watco

entered into the SPA with this opening paragraph:

> STOCK PURCHASE AGREEMENT dated as of Jan. 4, 2008, among
> CHRIS L. SALEK ("SALEK") AND PHILLIP A. PENNER ("PENNER"), the
> individual shareholders of Companies (collectively the "Shareholders"),
> RELOAD, INC., a Missouri corporation ("Reload"), RELOAD EXPRESS,
> INC., an Missouri corporation ("Express") (with Reload and Express
> being collectively referred to here as "Companies"), and WATCO
> MECHANICAL CORP., a Kansas corporation ("Purchaser").

(Dk. 123, Ex. U, at CS000040). The SPA specified that Watco was

purchasing the shares for "(i) a one time cash payment of" $7,500,000;  "(ii)

potential future earn out payments not to exceed" $4,500,000, "and (iii) the

assumption by Purchaser" of liabilities spelled out in the SPA. *Id.* at § 1.01.

The SPA also spells out that Kansas laws shall govern "all matters, including

but not limited to matters of validity, construction, effect, performance and

remedies." (Dk. 129-1, p. 46).

The SPA on earn-out payments began with the general provision

that the "[s]hareholders shall have the ability to earn up to a maximum

additional purchase payment  . . . per year to be equally divided between

PENNER AND SALEK (the "Earn Out Payments")." *Id.* at § 1.04.2(a). The

SPA specified a full annual earn-out payment if the closing EBITDA met the

"required EBITDA" and a pro-rated earn-out payment if the closing EBITDA did not meet the "required EBITDA" but exceeded the "base EBITDA." *Id.* at § 1.04.2(b). The SPA also spells out that "the term 'EBITDA' shall mean Net Income of the Companies for such calendar period (fiscal year) plus the sum of all amounts deducted arriving at . . . ." *Id.* at § 1.04.2(e). The SPA in its opening paragraph delineates the "Companies" as Reload and Reload Express. The SPA does not include any terms specifically restricting Watco from starting new subsidiaries or businesses of any kind. Nor is there an **express** term requiring Watco to place all new transloading business within Reload or prohibiting Watco from putting any new transloading business into another Watco subsidiary.

Also on January 4, 2008, the defendant Penner and the plaintiff Salek entered into separate written employment agreements with Reload and Watco. (Dk. 123, Exs. V and W). Both employment agreements provided for a term of employment through December 31, 2010, and an annual salary of $250,000. The agreements specified both were "employed by RELOAD, not Watco" and that Watco "join[ed]" the agreements merely "for the purpose of causing RELOAD to satisfy the obligations of the" SPA and the employment agreement. *Id.* at Exs. V and W § 1.  Both agreements included provisions that made them subject to and governed by Missouri law and also stated this was "the entire agreement and understanding by and between Employer and Employee with respect to the employment of

Employee, and no representations, promises, agreements, or understandings, written or oral, relating to the employment of the Employee and not contained herein, shall be of any force or effect." *Id.* at § 12. Watco's Vice President of Distribution, Kevin Goins ("Goins") supervised Salek and Penner. Goins joined Watco to manage its transloading growth initiatives, and he worked for Reload after Watco acquired it.

At the time of the sale, Reload operated four transloading facilities located in St. Louis, Missouri; La Crosse, Wisconsin; Glendale, Arizona; and Rockton, Illinois. The SPA resulted in Reload becoming a wholly-owned subsidiary of Watco which in turn was a wholly-owned subsidiary of Watco, Companies, Inc. After the SPA, facilities located in Oklahoma City, Oklahoma; Lawton, North Dakota (client—High Sierra); and Stroud, Oklahoma (client—High Sierra), were put within Reload.

With the housing market collapse, Reload's revenue was down at these facilities. The plaintiff offers testimony that Watco's insistence on "take or pay" contracts before investing in operations also had a negative effect on Reload's operations. Kevin Goins who oversaw Reload's operations opined that the "global economy" was the "primary reason" for Reload's struggling revenues. (Dk. 123, Ex. E, pp. 286-87). Watco has invested more than two million dollars in Reload.

Five months after the SPA, Goins sent an email to Watco's COO regarding Reload's personnel and performance. This email included critical

comments about Salek's performance. Eight months later, Goins replaced Salek as Vice-President of Sales and Marketing based on Goins' opinion that Salek was underperforming.  Two months after that in April of 2009, Goins reports to Watco's COO his plans for Reload that included moving Penner to the EOG project, moving Salek to the Rockford facility or terminating him, and reducing the salaries of both Salek and Penner.

On June 12, 2009, Penner, Reload and Watco entered into an amendment to the SPA and an amendment to the employment contract. These amendments reduced Penner's annual salary from $250,000 to $100,000 and added the difference to the potential earn-out payments under the SPA. By an email dated July 7, 2009, Penner informed Salek that he had agreed to these amendments. On July 15, 2009, at 6:06 a.m., Salek sent an email asking Penner if he knew whether "the transloading part of EOG [would] count toward their earn out" and if anybody had said this. (Dk. 123, Ex. LL). Penner emailed back that he "didn't' have an answer to that." *Id.* Later that night, Salek emailed Penner, "If we are being treated equally the EOG does not count toward our earn out. Kevin clarified that today." *Id.* at Ex. MM. Salek testified that Watco representatives told him on July 15th that EOG would not count but that he did not agree to the representatives' position on this. *Id.* at Ex. B, pp. 171-173. On July 17, 2009, Salek signed amendments to the SPA and the employment agreement that contain essentially the same terms as Penner's amendments. Salek's employment

with Reload/Watco subsequently ended on December 31, 2010, as specified in the written agreements.

On August 11, 2009, Watco Companies, Inc. created the wholly-owned subsidiary, Watco Transloading LLC ("WTL").  On August 28, 2009, Watco, WTL and another Watco subsidiary entered into a Transload Services Agreement with a collective of three corporations referred to as EOG Resources. Reload is not a named party in this contract. The contract called for loading and unloading services, as well as management and facility services at EOG's facilities in Oklahoma ("Stroud Facility") and in North Dakota ("Stanley Facility"). This will be referred to as the EOG Project.

Watco generated EBITDA statements on Reload for the years of 2008, 2009, 2010, and 2011, and the plaintiff acknowledges having received and reviewed these statements. These EBITDA statements generated by Watco for the plaintiff on Reload showed the following totals for 2008 a negative ($179,534.86); for 2009 a negative ($123,943.47); for 2010 a positive $860,918.96; for 2011 a positive $887,848.66; and for 2012 a positive $258,900.52. Watco calculated these EBITDA amounts based on the following transloading facilities within Reload, including,  St. Louis, Missouri; La Crosse, Wisconsin; Glendale, Arizona; Rockford, Illinois; Oklahoma City, Oklahoma; Stroud, Oklahoma (High Sierra); and Lawton, Oklahoma. These same EBITDA statements do not include any EBITDA generated by the EOG Project or any other projects or locations within WTL or other non-Reload

entities in Watco.

On February 15, 2011, Phil Penner sent to Rick Baden, a Watco executive, an email that stated:  "I was following up on the changes we talked about to my earn out agreement to add the companies to the documents that have been brought on board, EOG (LLC) and the OKC facility? Also the status of the earn out calculations?" (Dk. 123, (Ex. VV). As the plaintiff points out, this topic was not first raised in February of 2011. Approximately 21 months earlier, Watco's COO Towner copied Baden on an email sent to the CEO Webb.  It said, in part:

> In review of the Stock Purchase agreement, I believe we agree that the earn Out is limited to only those properties that were owned by and acquired from RELOAD. I'd suggest we use this as a bargaining chip to reduce Phil's salary to 100,000 with all of the difference added to his Earn Out potential with payment of the difference solely dependent on the earnings of the core properties. Additionally, I believe we should keep all of the new properties, esp EOG in Watco Companies, Inc and negotiate a separate deal to allow him to receive an Earn Out on this project. With regards to Chris Salek, we should then ask him to take a reduction with no ties to the EOG project. If you approve this approach, I'll proceed accordingly.

(Dk. 131, Ex. 36). There is also an email from Goins to COO Towner in May 2010 that included a reference to Penner being frequently concerned over whether Watco was trying to take away his earn out.

On March 2 and 3, 2011, Watco sent emails with the 2010 earn out calculations for Reload to both Penner and Salek. Later on March 2nd, Watco's Chief Accounting Officer ("CAO") also sent Penner an email saying, "Phil, we're putting together a version of the calculation to include the EOG

13

properties based on feedback from Terry [(COO)] and RB [(Rick Baden)]."
(Dk. 123, Ex. WW). On March 28, 2011, the CAO attached to an email to
Penner a "draft of the new earn out agreement." *Id*. at Ex. XX. Three days
later, the CAO sent Penner this email that said in part:

> Phil, I talked with Craig and RB tonight about our discussion from this
> afternoon. They're ok with advancing the $2.0 million tomorrow, but
> you need to go ahead and sign the earn-out agreement. This is just
> protection for Watco in the unlikely case of Watco paying you on
> Friday and then you becoming deceased before we finalize the deal.
> This way we'll at least have an agreement in place. Once we have had
> a chance to finalize a deal, we can shred the signed earn out if we
> decide to go with the bonus approach instead."

*Id*. at Ex. XX. On April 4, 2011, Penner sent the signed earn-out agreement
to the CAO. *Id*. This written agreement expressly defined the "Companies"
used for calculating EBITDA as Reload and WTL. Later that same day, the
CAO emailed Penner:

> Phil, after talking with our auditors, we're going to have to treat this as
> "compensation". This is because the original earn out related to the
> purchase price was adjusted to encompass entities that were not part
> of the sale and did not exist until much later. Additionally since the
> sellers are being treated differently, they are view this as a bonus. I
> have to believe the IRS will look at it the same way, but (as I
> mentioned before) I'm not much of a tax guy. Even if this is treated as
> a bonus rather than additional purchase price, we want to make sure
> you end up in the same place on an after tax basis. I've attached a
> calculation showing what the gross-up would be for taxes.
> Whichever way we treat this, the initial cash to you will be in excess of
> $2.0 million. I propose that I send you $2.0 million in the morning as
> an advance against which answer we come up with. Then you can
> bounce off of your tax guy to make sure he/she agrees.
> I'm traveling first thing in the morning but should be on the ground by
> 9:30 if you want to discuss. Please shoot me an email if you agree
> with the $2.0 million approach and I will have Jennifer Muckala send
> the funds in the morning.

*Id.* at Ex. YY. The $2 million payment then was made to Penner.

On April 16, 2011, the COA emailed a "Bonus Earn-Out Agreement" to Penner. *Id.* at Ex. AAA. Instead of signing this agreement, Penner continued to negotiate for capital gains treatment of the payments. Penner signed a Bonus Agreement dated December 30, 2011, which resulted in Watco paying another $1.4 million in addition to the earlier $2 million advance, and the agreement defines the payments as bonuses and "as compensation for Penner's efforts in growing and expanding Watco Transloading L.L.C. with EOG Resources, Inc." *Id.* at CCC. The Bonus Agreement also provides that Watco will indemnify and hold harmless Penner for any damages, losses or settlement and fees paid to Salek that arise from or are directly related to payment of this bonus. *Id.* The defendants represented in their reply memorandum that "[t]he parties later executed the bonus agreement at the end of the year when the employee payroll taxes were due" and cited the bonus agreement in support. (Dk. 150, pp. 42-43).

While both were employed with Reload as Vice Presidents of Operations, Penner and Salek's son, Mike, had important roles in designing, implementing, and providing the transloading operations at EOG's Stanley and Stroud facilities. Reload was their employer who paid their salaries for this work. Other Reload employees also were working on these projects. Goins testified that the employees working the transloading element of the

EOG project were all Reload employees. In late December 2009, Watco began transloading EOG's crude oil at the Stanley and Stroud Facilities.

As previously mentioned, the Watco defendants were compelled to produce discovery after the summary judgment pleadings were on file. From that recent production, the plaintiff has found emails that put in doubt the timing of the bonus agreement. Rather than executed on December 30, 2011 as it is dated, the emails suggest the bonus agreement was not signed until the first part of January of 2012, well after the actual $2 million payment in April of 2011, but was back-dated to 2011.

From this recent production, the plaintiff also uncovered several August 2009 emails from Watco's CAO to Watco's CFO indicating that "EOG has been set up as a Reload entity" and that the CFO replied that EOG should not be set up under Reload primarily because the EOG transload EBITDA "will not be applied to the Reload earn out." (Dk. 182-3). The plaintiff has another email written by Watco's CFO in January of 2011 showing that a transloading business was not put under Reload to avoid paying the plaintiff an earn-out and that Watco then arranged for Penner to receive his earn-out through a separate agreement:

> On the new Transload operations that Phil was asking about last week, we would like to put them outside of Reload, Inc., and put them into the same legal entity (Watco Transloading LLC) where Stanley and Stroud are today. It's my understanding from past conversations that Phil will get credit for these transloads in his earn out calculation, but not Christ [sic] (that's one of the reasons we want to have the new profit centers located in Watco Transloading LLC. We recommend that we create a new Earn Out agreements for Phil and terminate his old

one, that way we can include these other locations + Reload, over the
original terms of the earnout (again, Chris would be excluded).
(Dk. 182-6).

**COUNT ONE against Defendants Reload, Reload Express and Watco:
Breach of Contract and Implied Covenant of Good Faith and Fair
Dealing for Failing to Include EBITDA from EOG Project and other
Transloading Facilities in Calculating Salek's Earn-Out Payment**

Salek moves for summary judgment on this count, (Dk. 117, p.

11) as do the defendants Watco and Reload. (Dk. 122, p. 30). As one of the

plaintiff's theories of recovery listed in the pretrial order ("PTO"), this count

states:

> against Defendants Reload, Express and Watco for **Breach of
> Contract and the Implied Covenant of Good Faith and Fair**
> Dealing, by among other things, failing to pay any earn out payments
> to Plaintiff and failing to include the EBITDA from the Stanley Facility,
> the Stroud Facility, and other transloading facilities in their calculation
> that determined Plaintiff's earn out payment **(Count 1)**

(Dk. 107, pp. 12-13). Under the essential elements to this count, the

plaintiff asserts a breach of the SPA and the Amended Agreement in that the

Watco defendants failed "to pay any earn out payments to" the plaintiff and

failed "to include the EBITDA from the Stanley Facility, the Stroud Facility,

and other transloading facilities in their calculation[s]" for the year ending in

December of 2010 and other years. *Id.* at p. 14. The plaintiff claims the

defendants breached "the implied duty of good faith and fair dealing by

excluding the EBITDA from the Stanley Facility, the Stroud Facilities, and

other transloading facilities when they calculated Plaintiff's right to an earn

out payment for the year ended December 31, 2010, and other years." *Id.*

at p. 15. The plaintiff also claims violations of this implied covenant of good faith by the defendants entering into a side agreement for earn out payments to Penner and by paying Penner earn out money without paying any such monies to the plaintiff.

Governing Kansas Law on Breach of Contract

Under Kansas law which governs the SPA and the amended agreement, the following are the elements to a breach of contract claim: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 297 Kan. 2, 23, 298 P.3d 1083 (2013). "The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction." *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011) (*citing, e.g.*, *Anderson v. Dillard's, Inc.*, 283 Kan. 432, 436, 153 P.3d 550 (2007)). Thus, when the written contract's terms are plain and unambiguous, the court determines the parties' intent from the four corners of the contract and without reviewing extrinsic or parole evidence. *Simon v. Nat'l Farmers Org., Inc.*, 250 Kan. 676, 679-80, 829 P.2d 884, 887 (1992). "Interpreting a written contract that is free from ambiguity is a judicial

function and does not require oral testimony to determine the contract's meaning." *Carrothers Constr. Co., L.L.C. v. City of South Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231 (2009) (citation omitted).

"Whether an instrument is ambiguous is a matter of law to be decided by the court." *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 680, 829 P.2d 884 (1992). "Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning." *Id.* (citation omitted). "To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Gore v. Beren*, 254 Kan. 418, 427, 867 P.2d 330 (1994). A court is not to uncover "ambiguities or uncertainties where common sense tells us there are none." *Eggleston v. State Farm Mut. Auto. Ins. Co.*, 21 Kan. App. 2d 573, 574, 906 P.2d 661, (citations omitted), *rev. denied*, 257 Kan. 1091 (1995). "[T]he fact the parties differ as to what an ambiguous contract requires does not force this court to find that the contract was, in fact, ambiguous." *Ryco Packaging Corp. of Kansas v. Chapelle Intern., Ltd.*, 23 Kan. App. 2d 30, 36, 926 P.2d 669 (1996) (citation omitted), *rev. denied*, 261 Kan. 1086 (1997). "The court must not consider the disputed provision in isolation, but must instead construe the term in light of the contract as a whole, such that if construction of the contract in its entirety removes any

perceived ambiguity, no ambiguity exists." *Kay-Cee Enterprises, Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 843 (D. Kan. 1999) (citing *Arnold v. S.J.L. of Kansas Corp.*, 249 Kan. 746, 749, 822 P.2d 64 (1991)). "In the absence of more than one possible meaning to a word or phrase in a legal instrument, ambiguity does not exist." *Wenrich v. Employers Mutual Ins. Companies*, 35 Kan. App. 2d 582, 587-588, 132 P.3d 970 (2006) (citation omitted).

<u>Breach of Contract for Not Including EOG Project's EBITDA as New Transloading Business under Reload</u>

As noted above, the following facts are uncontroverted. The SPA defines EBITDA to "mean Net Income of the Companies," and the SPA in its opening paragraph delineates the "Companies" as Reload and Reload Express. The SPA does not include any terms specifically restricting Watco from starting new subsidiaries or businesses of any kind. Nor are there any express terms in the SPA or in the amended agreement that require Watco to place all new transloading business within Reload.

As full purchasers and sole owners of Reload, the Watco defendants argue the contract gives them the sole "discretion" to choose which business opportunities to put under Reload. And if the new business is not put under Reload, then it is not part of Reload's EBITDA calculation used to determine the earn-out payment. Thus, the defendants' position is that only those properties actually under Reload are included in Reload's EBITDA calculation. The defendants seek summary judgment on this theory because

the plaintiff cannot prove that the SPA expressly required the EOG Project's EBITDA to be under Reload.

In opposing summary judgment on this theory, the plaintiff argues the SPA "is ambiguous regarding whether new Transloading Facilities' EBITDA should count towards an earn out." (Dk. 147, p. 38). On this theory, the plaintiff contends the SPA is ambiguous in that the definition of "Companies" as Reload and Reload Express could mean either all new transloading properties acquired by Watco, as the plaintiff argues, or only those "properties existing or contemplated at the time of the" SPA, as subsequently described in a later bonus agreement between only Penner and Watco. (Dk. 144, Ex. 18). In arguing for summary judgment, the defendants posit there is no ambiguity in that they retained discretion to add new business under Reload and that the earn-out provisions did not freeze Reload's business property as of the SPA. The defendants describe their position as obvious and plain from the agreement, "only those properties actually added to Reload become part of the Reload EBITDA calculation." (Dk. 150, p. 54).

The court does not find the SPA ambiguous as to what entities are the "Companies," Reload or Reload Express, from which the EBITDA calculation is to be made. The contract is plain that this is a Reload EBITDA calculation, and this term necessarily includes all business and property within Reload. As for what future or new transloading business is to be put

21

under Reload, the plaintiff has no logical and factual argument for there being any express SPA terms governing this issue. The SPA defines "Companies" by referring to the particular names of existing companies and not to any kind or group of businesses. The SPA does not include any language that would suggest reading the companies' names as also meaning a general description of a business area akin to Reload or otherwise identifiable from or in relationship to Watco. There is nothing about the use of Reload's name in the SPA that reasonably yields any express term requiring some or all future transloading business to be put under Reload.

Instead of applying pertinent rules of contract construction to show a genuine uncertainty over two or more natural and reasonable readings of the SPA on how future transloading business would be handled, the plaintiff inappropriately resorts to extrinsic evidence (bonus agreement), including parol evidence (plaintiff's deposition testimony on contract negotiations), to create uncertainty. Such evidence becomes relevant only with an ambiguity which the plaintiff has not demonstrated. Only when a written contract's language is ambiguous may a court consider extrinsic or parol evidence to construe the contract. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013). In short, the court finds no ambiguity in the SPA that would allow the plaintiff to introduce extrinsic or parol evidence to prove that Watco breached an express term of the SPA in not including the EOG Project in Reload's EBITDA calculation. The

defendants are entitled to summary judgment on this claim, as the plaintiff is unable to prove that an express term of the SPA/amended agreement was breached in not including EOG Project as a new transloading business under Reload.

<u>Breach of Contract for Not Calculating Reload's EBITDA with EOG Project</u>

The defendants here address the plaintiff's possible theory that the EOG Project actually was part of Reload and that the breach then occurred in Watco's calculation of Reload's EBITDA. Seeking summary judgment, the defendants point to the uncontroverted facts that the EOG Project contracts were with WTL, not Reload, and that the EBITDA statements prepared for the plaintiff do not include any EBITDA generated by the EOG Project or any other projects or locations within WTL or other non-Reload entities within Watco. Moreover, the defendants argue that any such dispute is to be handled in arbitration under Section 1.04.2(d) of the SPA.

In response, the plaintiff argues the defendants prepared the 2010 EBITDA statements for Penner in March of 2011 which did include the EOG Project's income from crude oil operations at the Stanley and Stroud facilities. As stated above, these particular EBITDA statements were sent to Penner accompanied by an email that showed the EOG Project was not otherwise under Reload and these EBITDA calculations were being done preliminarily to Penner's signature on a new earn-out agreement with a

23

different definition of "Companies." These special 2010 EBITDA statements prepared for Penner do not evidence that Watco had made the EOG Project part of Reload.

The plaintiff next cites the deposition testimony of Kevin Goins about the work done by Reload employees for the EOG Project. Goins, however, testified that he did not have any reason to believe that the EOG Project business was not put under WTL, rather than Reload. (Dk. 123, Ex. E, p. 268). Thus, Goin's testimony is not evidence creating a genuine issue that the EOG Project contract/business was put under Reload for purposes of calculating Reload's EBITDA for the SPA.

In his supplementary sur-reply filed after the recent discovery, the plaintiff found in that discovery and now cites several emails in June, July and early August of 2009 exchanged between Watco officials that evidence initial treatment of the EOG Project as under Reload. (Dks. 182-3, 182-4, 182-5). The last of those cited emails is written by the CFO Baden who instructs:

> EOG should be set up as a WCI entity and not under Reload sub. This is primarily do (sic) to the fact that the EBITDA attributed to the EOG transload will not be applied to the Reload earn out. For reporting purposes, we can still include it in the WTIS grouping (similar to St. Louis Intermodal), but the legal entity needs to be under WCI. We will actually set the Stanley and Stroud locations up as LLC's under WCI.

(Dk. 182-3, p. 2). This evidence shows that the CFO directed that EOG would not be a part of Reload. Thus, the plaintiff has not come forth with any genuine issue of material fact that the EOG Project contract/business

was actually put under Reload and remained there at the year-end so as to be included in Reload's EBITDA. Consequently, the court need not decide the applicability of the arbitration provision to this claim or the other related issues raised concerning the parties' timely and effective compliance with the procedural requirements in the arbitration provision.

Breach of Contract for Not Paying Salek an Earn-Out in April 2011

The pretrial order reflects that under the plaintiff's first theory he also alleges that the defendant Watco's disparate payment of an earn-out to Penner in April of 2011 and none to Salek is in breach of the SPA's earn-out provisions. (Dk. 107, p. 15). The plaintiff points to the SPA's provision at § 1.04.2(a) providing that Salek and Penner "shall have the ability to earn up to a maximum additional purchase payment of . . . ($1,500,000) Dollars per year to be equally divided between PENNER AND SALEK (the Earn out Payments)." (Dk. 129-1, p. 11). The plaintiff reads this provision as preventing Watco from making an earn-out payment to just one of them. The plaintiff also points to the SPA provision § 7.03 that prohibits amendments to the SPA "except by an instrument in writing signed on behalf of each of the parties hereto." (Dk. 129-1, p. 38).

The plaintiff alleges that Watco entered into an Earn Out Agreement with Defendant Penner without first obtaining Plaintiff's written consent in April of 2011. (Dk. 147, p. 38). Watco paid Penner what was calculated and described as an earn-out also in April of 2011 without paying

anything to Salek in breach of the SPA. The plaintiff also points to subsequent Watco emails with Penner showing that the payments were calculated in the same manner as earn-out payments and were intended to be earn-out payments as contemplated under the SPA/amended agreement. Citing emails also produced in the most recent discovery, the plaintiff argues the Bonus Agreement between Watco and Penner was not executed until January of 2012 and was backdated to December 30, 2011. The plaintiff argues this payment was fixed as an earn-out for tax purposes at the year's end and cannot be re-characterized by the 2012 Bonus Agreement. Finally, the plaintiff points to the CFO Baden's email of January 24, 2011, where Baden openly discussed not putting new business under Reload to prevent paying an earn-out to Salek and discussed entering a new earn-out agreement with Penner. This new agreement with Penner would include more locations, terminate the old earn-out agreement, and allow Penner to receive an earn-out based on new business without paying Salek. The plaintiff argues the evidence creates a genuine issue of material fact on whether the April 2011 payment to Penner was contemplated to be an earn-out payment. If it was, then Watco's failure to pay an equal division to Salek could be a breach of the SPA.

The Watco defendants contend they could not have breached § 7.03 because the parties had consented and entered into separate earn-out agreements with amendments to the SPA in July of 2009, and these

amendments altered the original earn-out provisions. The defendants posit

that, "[w]hile the previous earn-out provision applied to both Plaintiff and

Mr. Penner, the new provisions were completely separated in two individual

agreements, signed separately by Plaintiff and Mr. Penner." (Dk. 122, p. 41).

The defendants conclude these separate agreements "superseded" the

provision about equal payments in the SPA, "given that there were now

separate earn-outs for each individual, and not a single earn-out for them to

share, as in the original SPA." (Dk. 132, p. 41). The defendants also argue

the plaintiff cannot show causation or damages under this theory, because

the later agreement between Penner and Watco "had nothing to do with

Plaintiff," "did not change Plaintiff's earn-out opportunity in any way," and

"was simply a mechanism for rewarding Mr. Penner for work that he had

done on the EOG project." *Id.* at p. 42.

 The controverted facts and the related arguments show that

neither side is entitled to summary judgment on this theory. It is true that

the "Amendment to the Stock Purchase Agreement" was signed by Penner in

June of 2009, and a separate "Amendment to the Stock Purchase

Agreement" was signed by Salek in July of 2009. The amendments contain

essentially the same terms and accomplish as revealed in the whereas

recitals the amendment of "the Stock Purchase Agreement to add any actual

reduction in base salary of . . . [Penner's or Salek's] to that portion of the

Earn Out Payment applicable to . . . [Penner or Salek]." (Dk. 131-45; Dk.

27

144, Ex. 45). The amendments spell out how the salary reductions would be added back into the annually available earn-out payments. The final two provisions of the Amendments were:

> 3. Solely as to matters specifically addressed above and solely as between the parties to this Amendment, in the event of a conflict between the Stock Purchase Agreement and this Amendment, the terms and conditions of this Amendment shall govern.
> 4. Except as specifically modified by this Amendment, all terms and conditions of the Stock Purchase Agreement shall remain in full force and effect.

*Id.* While these amendments specifically address how the salary reductions would be added to the eligible earn-out payments, the amendments do not specifically modify or supplant other terms of the SPA's earn-out provisions. The defendants fail to show that the parties intended the amendments to modify or supersede specifically the SPA provision requiring earn-out payments to be equally divided between Penner and Salek. Nor have the defendants shown how the operation of these separate, but identical, amendments would necessarily supersede the SPA's equal division of payment provision.

The plaintiff argues the defendants' violation of § 7.03 effectively resulted in Watco and Penner executing a "secret earn out agreement" that denied him his equal division of Watco's earn-out payment solely made to Penner. The plaintiff also challenges Watco's claim that the payment was a bonus for Penner's work for Watco Transloading, because such work would have been contrary to Penner's other agreements with Reload/Watco

28

regarding employment, confidentiality and non-competition.

The plaintiff is entitled to go forward with this claim, as the evidence is certainly disputed over whether the Penner and Watco actually amended the terms of the SPA by their subsequent agreements and, if so, when this happened. Salek did not sign any amendments to the SPA that addressed these changes. The plaintiff's damage theory for a breach of § 7.03 is less clear than for the breach of § 1.04.2(a). Still, the plaintiff has linked these claims in alleging that the separate earn-out agreement and bonus agreement are invalid attempts to amend the SPA without his approval required by § 7.03 and that, as a result, the April 2011 payment to Penner was an earn-out payment made in breach of § 1.04.2(a). There are enough facts here from which a reasonable person could find that Watco's 2011 payment to Penner, no matter how Penner and Watco later chose to describe and characterize it and no matter whether it was calculated as required by the SPA or not, was intended to be and contemplated to be an "earn-out payment" to Penner under § 1.04.2(a) "to be equally divided between PENNER AND SALEK." (Dk. 129-1, p. 11). Neither side is entitled to summary judgment on the arguments that have been presented.

<u>Violations of the Implied Duty of Good Faith and Fair Dealing</u>

As set out in the pretrial order, the plaintiff alleges the defendants Watco and Reload violated "the implied duty of good faith and fair dealing by excluding the EBITDA from the . . . [EOG Project] when they

calculated Plaintiff's right to an earn-out payment for the year ended December 31, 2010, and other years." (Dk. 107, p. 15). The plaintiff also claims violations of this implied covenant of good faith when the defendants entered into a side agreement for earn-out payments to Penner and paid Penner earn-out money without paying equal monies to the plaintiff.

Kansas law recognizes an implied "duty of good faith and fair dealing . . . in every contract." *Estate of Draper v. Bank of America, N.A.*, 288 Kan. 510, Sy. ¶ 13, 205 P.3d 698 (2009). "The duty requires that contractual parties refrain from intentionally doing anything to prevent the other party from carrying out his or her part of the agreement, or from doing anything which will have effect of destroying or injuring the right of the other party to receive the fruits of the contract." *First Nat. Bank of Omaha v. Centennial Park, LLC*, 48 Kan. App. 2d 714, 729, 303 P.3d 704 (citation omitted), *rev. denied*, 297 Kan. No. 3 (v) (2013). The Kansas Court of Appeals has recognized this duty arising when a party is vested with discretion in its contractual performance:

> "'Good faith limits the exercise of discretion in performance conferred on one party by the contract. When a discretion-exercising party may determine aspects of the contract, such as quantity, price, or time, it controls the other's anticipated benefits. Such a party may deprive the other of these anticipated benefits for a legitimate (or good faith) reason. The same act will be a breach of the contract if undertaken for an illegitimate (or bad faith) reason.'" *Meier's Trucking Co. v. United Constr. Co.*, 237 Kan. 692, 701, 704 P.2d 2 (1985) (Holmes, J., dissenting)(quoting Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369, 372-73 [1980]).

*CIT Group/Sales Financing, Inc. v. E-Z Pay Used Cars, Inc.*, 29 Kan. App. 2d

676, 680, 32 P.3d 1197, *rev. denied*, 272 Kan. 1423 (2001). "'[E]ssential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing.'" *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 965, 298 P.3d 250 (2013) (quoting *Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 (1987)). The violation of the duty of good faith and fair dealing is a question of fact for the jury. *Waste Connections of Kansas*, 296 Kan. at 965.

The defendants seek summary judgment in that the plaintiff's "assertion of an implied duty contradicts both the terms of the contract and the pre-formation negotiations." (Dk. 122, p. 36). The defendants argue that an implied obligation to place future transloading business within Reload would be contrary to Watco's full ownership and control of Reload and to Watco's rejection of the plaintiff's efforts to bargain for such a provision. The defendants also cite the SPA's integration clause that specifies the entire agreement is found in the written SPA and supersedes all prior agreements. The defendants deny doing anything that has frustrated the plaintiff's ability to receive his earn-out, specifically they did nothing to undermine the performance of Reload's existing locations sold to Watco. The defendants point to their addition of several facilities to Reload and their investment of two million dollars in Reload. Finally, the defendants argue summary judgment is appropriate because this implied duty cannot supply new contract terms and there is no breach of this implied duty when "one of the

contracting parties complains of acts specifically authorized in the agreement." (Dk. 122, p. 36, quoting *McGuire v. American Family Mut. Ins. Co.*, 448 Fed. Appx. 801, 813 (10th Cir. Sept. 9, 2011)).

The plaintiff comes forward with his deposition testimony that Watco officers assured him during contract negotiations that all growth in the transloading business would go under Reload. Salek testified that in negotiations he was "comfortable" with CEO Webb's promise "that all the growth would be in Reload." (Dk. 131-3 p. 13). Salek said he considered a contract provision that would keep other Watco subsidiaries from engaging in transloading, but he "elected to trust the Watco people, Rick Webb specifically." (Dk. 131-3, p. 26). The plaintiff cites the recently produced emails that reveal Watco officials' deciding to create new profit centers in WTL and to put EOG and other new business in them so that credit for these transloads would not go to Reload and be included in the plaintiff's earn-out calculations and so that "new" earn-out agreements could be made with Penner which included this new transloading business. The summary judgment record has evidence that Reload employees, like Penner and others, worked on this new transloading business and related projects and that some Watco officials had even initially considered including them as part of Reload.

The court finds there are questions of material fact which preclude a full granting of summary judgment for either party on these good

32

faith and fair dealing claims. It is certainly a reach to say the implied duty of good faith obligates Watco to include **all** new transloading business under Reload particularly when the SPA does not have such a term despite the parties' negotiations over this issue in October of 2007. To read such a duty into the contract would constitute writing in an essential term of a contract on which the minds of the parties apparently have not met, and the court cannot supply such terms "by the implication of good faith and fair dealing.' (Citations omitted)." *Bonanza, Inc. v. McLean*, 242 Kan. at 222. The plaintiff is precluded from pursuing such a claim.

On the other hand, the SPA does not foreclose Watco from adding new business to Reload. Indeed, the summary judgment record evidences that Watco's acquisition of Reload was intended to position itself for expanding into the area of transloading using the experience and knowledge of Salek and Penner, and Reload's employees. Watco claims the SPA vests it with the "discretion" to decide which future businesses would go under Reload. Of course, being the "discretion-exercising party," Watco's determination of where to locate the new businesses would "control" Salek's "anticipated" earn-out "benefits." *See CIT Group/Sales Financing, Inc. v. E-Z Pay Used Cars, Inc.*, 29 Kan. App. 2d at 680. As such, Watco "may deprive the other of these anticipated benefits for a legitimate (or good faith) reason," but it would be a violation of this implied duty "if undertaken for an illegitimate (or bad faith) reason." *Id.* Whether Watco's exercise of its

discretion in choosing which, if any, expansions in business/property to put under Reload was in good faith, or not, is a question of fact for the jury. *Waste Connections of Kansas*, 296 Kan. at 965. There is sufficient evidence in the summary judgment record from which a reasonable factfinder could conclude that Watco's placement of the EOG Project under WTL was not in good faith but done to frustrate Salek's ability to receive the benefits of his earn-out provisions. Similarly, there is sufficient evidence of record from which one could conclude that Watco did not act in good faith in moving the EOG Project to WTL, in negotiating and entering into a side agreement with Penner for him to receive his earn-out payments from this new business, and by paying Penner his earn-out money without paying equal monies to the plaintiff.

Before leaving this claim, the court briefly addresses the defendants' citation of *Rubin Squared, Inc. v. Cambrex Corp.*, 2007 WL 2428485 (S.D.N.Y. Aug. 24, 2007), *aff'd*, 321 Fed. Appx. 14 (2nd Cir. 2009), as a relevant authority. In that case, the plaintiff sold its business assets for a sum certain and a potential additional amount in earn-out payments. The plaintiff sued the defendant on a number of theories including the violation of the implied duty of good faith and fair dealing under Maryland law. The court rejected an implied duty to expand the purchased facilities "when such a term was not included in the contract, particularly when language supporting such an obligation was expressly rejected by Defendant." 2007

34

WL 2428585 at *11. As for the defendant's acquisition of a competitor, the defendant's assignment of seller's principal to supervise the competitor and the diversion of resources to the competitor, the court held:

> The acquisition of Marathon cannot constitute a violation of the duty of good faith and fair dealing. An earn-out provision in a corporate acquisition agreement does not inherently prohibit the buyer from acquiring the purchased company's competitors in the future, nor does such a later acquisition naturally prevent the first-acquired company from increasing its earnings. Moreover, Plaintiff explicitly requested and was denied a veto over future acquisitions, making it plain that the APA allowed Defendant to make such acquisitions. As to diversion of Jacques Rubin's time from Bio Science, the APA contained an explicit provision barring Defendant from re-directing "a material portion" of Rubin's efforts from Bio Science unless he consented. Plaintiff does not allege that Defendant violated this provision of the APA by giving Rubin responsibility for Marathon, and therefore it cannot sustain a claim that the same conduct violated an implied duty.
>
> Diversion of revenue to, or expenses from, Marathon would, by contrast, likely constitute bad faith. It is inherent in an agreement to share a percentage of a business unit's earnings that the unit's earnings will not be artificially diverted to another unit not covered by such profit-sharing obligations. Plaintiff has not presented any evidence of diversion of revenue by Defendant, however. The sole evidence even vaguely relevant to the point, Jacques Rubin's deposition testimony and declaration concerning the Dynport contract, does not constitute diversion. That Marathon continued to compete for contracts even after being acquired by Defendant does not constitute bad faith on Defendant's part, nor does the fact that Marathon charged lower prices, giving the client leverage to renegotiate with Bio Science. The APA did not contain any provision suggesting that Jacques Rubin would control any competing companies acquired by Defendant or that such companies would be run to maximize Bio Science's earnings. Plaintiff, in essence, suggests that Defendant could only abide by its implied duty of good faith and fair dealing if, having purchased Marathon, it restrained it from competing with Bio Science as it had prior to the acquisition. Maryland's law makes no such demands. Unless Defendant actively diverted Bio Science's earnings to Marathon, it did not act in bad faith.

2007 WL 2428485 at *11-*12. From this decision, Watco extracts that the

implied duty of good faith does not write in terms which were the subject of pre-contractual negotiations but were not included in the final written agreement and that the purchase of a competing business is not the breach of an implied duty arising out of an earn-out provision. What Watco overlooks is that the decision does recognize that "diversion of revenue" would "likely constitute bad faith." There is enough evidence from which one could argue that Watco's placement of EOG under WTL after Reload employees had worked and were working on this project was a diversion of revenue. Moreover, the court in *Rubin Squared* distinguished its case from *O'Tool v. Genmar Holdings, Inc.*, 387 F.3d 1188 (10th Cir. 2004), in part because "there was 'ample evidence' that Genmar intended to prevent Horizon from achieving the earn-out," "there is no evidence [here] of specific affirmative actions taken by Defendant to impede Plaintiff's achievement of the earn-out," "[n]or is there substantial evidence that Defendant intended to do so." 2007 WL 2428485 at *12. The plaintiff Salek arguably has evidence here of affirmative efforts by Watco to impede Salek's receipt of earn-out payments and to provide Penner with his earn-out payments. While the court grants summary judgment against the plaintiff's claim of an implied duty of good faith to include all future transloading business under Reload, the defendants' motion is denied in all other respects on this implied duty claim.

Admissibility of Bonus Agreement

The plaintiff argues the bonus agreement between Watco and Penner is a settlement agreement that is "not admissible--on behalf of any party--either to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a). (Dk. 117, p. 14). The plaintiff cites evidence that Penner "aggressively" argued for his earn-out payments and weekly called his boss complaining about not receiving his earn-outs and accusing his employer of preventing his receipt of them. The plaintiff characterizes the bonus agreement executed after he filed this lawsuit as Watco settling Penner's disputes over his earn-out payments. The plaintiff highlights references to this pending lawsuit found in the bonus agreement.

The defendants deny there was a claim with Penner which the bonus agreement settled. If there was any arguable claim, it was settled in April of 2011 with the initial payment and revised earn-out agreement with Penner. All of this was done before the plaintiff filed his federal lawsuit. The terms of the bonus agreement did refer to this lawsuit and did address possible consequences in this lawsuit because of changes made to Penner's earn-out agreements. The defendants demonstrate the bonus agreement, if a settlement agreement, is not evidence regarding the compromise or attempt to compromise "the" plaintiff's claim in this lawsuit. Thus, the plaintiff's argument to exclude evidence of the bonus agreement does not meet the purposes of Rule 408.

For purposes of this motion, the court denies the plaintiff's request to exclude evidence of the bonus agreement. First, the plaintiff does not show how the defendants are offering evidence of this agreement to prove or disprove the validity of Penner's supposed dispute in violation of Rule 408. Second, the plaintiff has not established how Penner's expressed concerns over receiving earn-out payments amount to a claim in this case. Finally, the plaintiff does not offer any reasoned argument for excluding this evidence based upon the limited scope and purpose of Rule 408.

**COUNT TWO Against Defendants Reload, Express and Watco: Declaratory Judgment that the EBITDA from EOG Project and other Transloading Facilities Owned and Operated by Watco Should Count Towards Salek's Earn Out Payments for December 2010 and Future Years**

The defendants move for summary judgment on this count by simply referring back to the arguments made against count one. The plaintiff responds referencing his analysis that opposed the defendants' arguments on count one. Count two appears to be no more than a claim of declaratory judgment relief based on the same theories and claims advanced in count one. To the extent declaratory relief remains available on the plaintiff's remaining claims under count one, the court will deny summary judgment on this count and grant summary judgment in all other respects.

**COUNT THREE Against Defendant Penner:  Breach of Fiduciary Duty**

The plaintiff here alleges in the pretrial order that by virtue of the SPA, amendments to SPA and the employment agreements he and

38

Penner were devoted to a common enterprise for the sharing of future earn-out payments, were joint venturers in an enterprise to maximize Reload's EBITDA and related earn-out payments, and were "in a close relationship of trust and confidence and were bound by the same fiduciary duties and standards of good conduct and fair dealing required of partners." (Dk. 107, p. 16). The plaintiff asserts Penner violated his fiduciary duties in entering into a "side-agreement with Defendant Watco" as "part of a scheme by the Defendants to cheat Plaintiff out of his earn out payments." *Id.* at 17. The plaintiff alleges the disparity of earn-out payments between him and Penner is owing to Penner's breaches of his fiduciary duties.

Penner moves for summary judgment denying the evidence is sufficient to go forward on any claim of a joint venture existing between them. The terms of the earn-out provision in the SPA do not give rise to a joint venture, because it involves no risk to them, it does not give them joint ownership or control over anything, it does not entail sharing profits or losses, it gives them no voice in determining net earnings or salaries, and it does not require them to do anything but receive earn-out payments by the terms of the SPA. Penner argues that after selling Reload he and Salek became Reload's employees who enjoyed contingent interests not unlike employee stock options, because the earn-out payments were not directly tied to how either of them performed but were based on Reload's general performance as measured by its EBITDA and the SPA thresholds for earn-

outs. Penner argues the plaintiff's joint venture theory would encompass any employee who has stock options dependent on the employing company's performance. Penner also applies the factors relevant to the determination of a joint venture and concludes that the plaintiff cannot carry his burden here as a matter of law.

Salek responds with two theories of a common-law fiduciary duty. The first is based on them being partners in other businesses. The second is alleged to arise from their former partnership in Reload and their mutual ongoing benefits under the executory SPA and its earn-out provisions. Salek's third theory is that he and Penner had a joint venture to obtain earn-out payments which "continues until their partnership [is] concluded," that is, the expiration of the earn-out provisions in December of 2017. (Dk. 128, p. 19). He argues the SPA is an executory contract that "expressly evidences their joint venture" in that the earn-out payments are an equitable interest owned by them and shared by them which depend on Reload's revenue. *Id.* at 19. Their employment agreements had them working together at Reload and "making money for Reload." *Id.* at 20. Salek interprets the different relevant factors for determining a joint venture as fulfilled here. Salek finally alleges that the specific EOG project earnings that were not shared with him are the damages caused by Penners' breach of fiduciary duties.

Penner replies that Salek's theory of a common-law duty being

implicated here from their other partnerships in Reload Alabama and PC Partners is not a claim appearing in the pretrial order. Penner also denies that any alleged fiduciary duty here could be legally based on their former partnership and denies that the SPA or employment agreements evidence an ongoing partnership. Penner specifically notes that all such agreements establish Salek's relationship with Watco and that Penner retained no control over any consideration that Watco would be paying Salek. Penner reiterates that with Reload's sale, he and Salek became co-employees with no ownership, control or decision-making authority in Reload, and so they could not be fiduciaries between themselves with respect to Reload/Watco and their duties to calculate and pay earn-outs. Finally, Penner refutes any argued basis for finding an agreement with fiduciary duties involving the earn-out payments.

Rule 16(d) of the Federal Rules of Civil Procedure provides that the pretrial order "controls the course of the action unless the court modifies it." To serve its purpose of having all cards turned over on the table, the rule presumes the attorneys have "fully and fairly disclose[d] their views as to what the real issues of the trial will be." *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276 (10th Cir. 2006) (internal quotation marks and citations omitted). Thus, the Tenth Circuit's rule is plain:  issues not found or included in the pretrial order are not part of the district court's case and are regarded as waived. *Id.* at 1276-77. Courts are to "liberally construe" pretrial orders

"to cover any of the legal or factual theories that might be embraced by their language." *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979) (internal quotation marks and citation omitted). This does not mean that courts are "'to fabricate a claim that a plaintiff has not spelled out.'" *Shaub v. Newton Wall Co/UCAC*, 153 Fed. Appx. 461, 464-465 (10th Cir. Oct. 19, 2005) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1367 n.1 (11th Cir. 1999)). A party cannot avoid summary judgment by raising new theories, for unless there is a proper "motion to modify or amend the pretrial order pending, the court is well within its discretion to exclude such assertions from the action." *Hullman v. Board of Trustees of Pratt Community College*, 950 F.2d 665, 667 (10th Cir. 1991).

From what the plaintiff includes in the pretrial order as his allegations and elements for this fiduciary duty claim, the court finds no element or theory that a fiduciary duty involved here would arise from the partnerships in Reload Alabama or PC Partners and would be violated by Penner's conduct as alleged in the pretrial order. Instead, the pretrial order on this claim reads that the court is to presume an enterprise "without actual partnership" and to presume a close relationship with fiduciary duties like those "required of partners." (Dk. 107, p. 16). The plaintiff has not filed a motion to modify or amend the pretrial order. The court summarily rejects this waived theory of a common-law fiduciary duty arising from other partnerships in Reload Alabama or PC Partners.

As authority for his claim that former partners of a dissolved partnership may owe a continuing fiduciary duty to each other that is "breached if the ex-partner attempts to divert partnership opportunities for his personal benefit to the detriment of his former partners" or if "the remaining partners exclude the ex-partner from the benefits of an existing partnership opportunity," the plaintiff cites *Crouse v. Brobeck, Phleger & Harrison*, 67 Cal. App. 4th 1509, 1551 (Cal. App. 2nd Dist. 1998). The California court drew the line of former partners having ongoing fiduciary obligations at the "duty to share the benefits of existing partnership business opportunities with their former partners." *Id*. The defendant Penner rightly observes that the plaintiff is not claiming any lost opportunities which would have existed before the partnership dissolved on January 8, 2008, and were later denied to Salek. After the sale, as Penner notes, he did not retain any ability to share business opportunities as he transferred all his interest and ownership in the Reload business. The plaintiff fails to make a persuasive showing how his claim even comes within the scope of this California holding were it to be followed in Kansas.

Next, the plaintiff cites *Jackson v. Maguire*, 75 Cal. Rptr. 16, 20-21 (Cal. App. 5th Dist. 1969), for the authority that a majority shareholder may still have a fiduciary duty to other shareholders after stock is sold and transferred if the purchasers have promised to provide additional consideration. The court again does not see the applicability of this California

43

court holding to the facts of this case. The SPA here fixes the consideration to be paid including the potential earn-out payments. The plaintiff fails to show how Watco's duty to make the earn-out payments here was conditioned upon Penner's involvement or actions or was otherwise subject to any control or authority given to Penner such as would trigger a fiduciary duty.

The Kansas Supreme Court recognizes two general kinds of fiduciary relationships—those either created by contract or by legal proceedings and those "implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the question transactions." *Denison State Bank v. Madeira*, 230 Kan. 684, 691, 640 P.2d 1235 (1982). The determination of the second kind is more difficult and depends on the particular facts and circumstances. *Id*. The Kansas Supreme Court has recognized that:

> It is difficult to define the term "fiduciary relation." It may be defined generally as a relation in which, if a wrong arises, the same remedy exists against the wrongdoer on behalf of the principal as would exist against a trustee on behalf of the cestui que trust. The term "fiduciary relation" has reference to any relationship of blood, business, friendship, or association in which one of the parties reposes special trust and confidence in the other who is in a position to have and exercise influence over the first party. In *Denison State Bank v. Madeira*, 230 Kan. 684, 640 P.2d 1235 (1982), it was held that whether or not a confidential or fiduciary relationship exists depends on the facts and circumstances of each individual case. This court has refused, for that reason, to give an exact definition to fiduciary relations. . . . It may exist under a variety of circumstances and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the

confidence. *Lindholm v. Nelson*, 125 Kan. 223, Syl. ¶ 3, 264 Pac. 50 (1928).

*Brown v. Foulks*, 232 Kan. 424, 430-31, 657 P.2d 501 (1983). Fiduciary relationships "necessarily spring from an attitude of trust and confidence and are based upon some form of agreement, either expressed or implied, from which it can be said the minds have met in a manner to create mutual obligations." *Paul v. North*, 191 Kan. 163, 170, 380 P.2d 421 (1963). "The Supreme Court of Kansas has cautioned against an approach which would unfairly 'convert ordinary day-to-day business transactions into fiduciary relationships where none were intended or anticipated.' *Denison*, 230 Kan. at 696." *Rajala v. Allied Corp.*, 919 F.2d 610, 615 (10th Cir. 1990), *cert. denied*, 500 U.S. 905 (1991). In that regard, the Tenth Circuit "has also recognized that conscious assumption of the alleged fiduciary duty is a mandatory element under Kansas law." *Id.* (citing *Hotmar v. Lowell H. Listrom & Co., Inc.*, 808 F.2d 1384, 1387 n. 3 (10th Cir. 1987); *cf.* 36A C.J.S. *Fiduciary*, 385 (1955) ("As a general rule, a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship") (footnotes omitted).");
*see Terra Venture, Inc. v. JDN Real Estate Overland Park, L.P.*, 443 F.3d 1240, 1245 (10th Cir. 2006). "An ordinary business relationship should not be construed as a fiduciary relationship, absent clear intent by the parties." *Terra Venture*, 443 F.3d at 1245.

45

The plaintiff asserts a fiduciary relationship arises from having been co-owners wanting the maximum payment from selling their ownership interests. The plaintiff insists the fiduciary duties between co-owners did not end with the SPA because of its executory character tied to the earn-out provisions. The plaintiff cites *Kindergartners Count, Inc. v. DeMoulin*, 249 F. Supp. 2d 1233, 1247 (D. Kan. 2003), for Kansas law identifying implied fiduciary relationships arising from "a position of peculiar confidence placed by one individual in another," from "a person having a duty to act primarily for the benefit of another," from a person having and exercising "influence over another." The plaintiff then cites *Nelson v. EV3, Inc.*, 2010 WL 4818290 (N.D. Cal. 2010), which denied a motion to dismiss a breach of fiduciary duty claim brought by selling shareholders against the purchasing corporation for obligations related to using commercially reasonable efforts to market and distribute products from which the shareholders would receive earn-out proceeds. Neither case offers much support for the plaintiff's fiduciary duty claim alleged here.

The plaintiff does not come forth with sufficient facts from which a reasonable jury could find that Penner had an implied fiduciary relationship with Salek after the sale of Reload based on the earn-out provisions. The facts as presented by the plaintiff simply do not support an inference that Penner consciously assumed a fiduciary duty toward Salek following the sale. The deposition testimony of Penner cited by the plaintiff does not support

this proposition. Salek's deposition testimony was that he believed they had fiduciary responsibilities to each other because they had been former partners, because they had other businesses together, and because they were still part of Reload and were responsible to make sure the sale of Reload was successful and to not compete with each other. Notably, there is nothing in this testimony or in the plaintiff's other evidence from which to infer that Penner consciously assumed a duty to act as a fiduciary with regard to Salek's right to receive earn-out payments.

The court agrees with Penner that the terms of their respective employment agreements and the SPA do not evidence any significant identifying features of an implied fiduciary relationship. They both sold their complete ownership in Reload and retained no business interest in it. They each executed employment and confidentiality agreements with Watco. Penner's duties to Reload and Watco in the employment agreement included overseeing daily operations and growing Reload's revenue and business and other duties reasonably assigned to him by Kevin Goins. It also was agreed that Penner would have "significant input over all aspects of operations of Reload, including location, spending and personnel." (Dk. 129-1, p. 57). The employment agreement provided:

> During the term of this Agreement, Employee shall devote his reasonable full business time, attention and energies, as well as his best talents and abilities, to the business of Employer in accordance with this stated duties and Employer's reasonable instructions and directions in the best interest of Employer going forward, and shall not without Employer's prior consent be engaged in any other employment

47

for any other employer.

(Dk. 129-1, p. 57). While Penner had duties and responsibilities toward Reload as his employer, he lacked control over it such that he could act for the best interest of Salek or anyone else other than his employer.  He was contractually obligated to act in the best interest of his employer Reload and Watco. In short, there are no facts evidencing that Penner consciously assumed a position of peculiar confidence with respect to Salek, that he owed a duty to act primarily for the benefit of Salek, or that he possessed the authority and control of exercising influence over another pursuant to an implied fiduciary relationship. Penner is entitled to summary judgment on this claim.

The plaintiff's last attempt to prove a fiduciary relationship is based on what he alleges to be "a joint venture to obtain earn out payments" that "continues until their partnership is concluded: *i.e.,* when the final earn out payment is made or the earn out provisions otherwise expire on December 31, 2017." (Dk. 128, p. 18). The plaintiff contends that he and Penner had associated to obtain their shared equitable interest in the earn-out payments as provided in the SPA. He argues they had agreed to work for Reload and understood its commercial success meant sharing earn-out payments. Looking at the five factors used by Kansas courts in determining if a joint venture exists, the plaintiff argues he and Penner had a joint ownership in the equitable interest for earn-out payments and Watco

48

was obligated to pay them both; they shared in profits in the form of an earn-out; the employment agreement gave them significant input into Reload's operations not unlike management and direction of Reload; they had expressed their intention in the employment agreement to maximize Reload's profitability and, in turn, their earn-out payments; and their salaries were fixed with subsequent changes related to the final purchase price. The plaintiff denies that the SPA precluded their joint venture and asserts he was damaged by Penner's breach in that it caused him to lose his earn-out payment.

Penner makes several convincing arguments for summary judgment. Their receipt of earn-out payments was not tied or dependent on their personal contributions. The SPA required Watco to make earn-out payments if Reload did well, regardless of their personal contributions to the business. Instead, Salek's right to earn-out payments did not expire when his employment at Reload ended in December 2010. Penner's point is clear: the plaintiff does not allege a joint venture that involves any risk. Because the earn-out payments here are not conditioned or tied to the performances of Salek or Penner, what the plaintiff calls a joint venture would mean co-employees with employee stock options would be in a joint venture. Indeed, that is all Salek and Penner are in regards to each other after the sale of Reload, they are former co-sellers of Reload and now co-employees. As for the five-factor analysis, Penner points out that they had no real control over

whether the earn-out payments were made. The payments depended on

Reload's EBITDA over which they had little more control than another

employee. There is no sharing in all of Reload's profits and losses, as their

sharing was limited to profits and only those profits which met the higher

thresholds established in the SPA. Their authority over Reload was not final

decision-making for they reported to Kevin Goins. The plaintiff has no

evidence of Penner's intention to enter into a joint venture, and the written

agreements establish duties only between them and Reload/Watco. Finally,

Penner had no control over salaries paid to anyone.

Kansas law generally recognizes that "a 'fiduciary duty' exists

among joint venturers." *Terra Venture,* 443 F.3d at 1245 (citations and

internal quotation marks omitted). A joint venture "is an association of two

or more persons to carry out a single business enterprise for profit," and it

exists "only by the agreement of the parties." *Modern Air Conditioning, Inc.*

*v. Cinderella Homes, Inc.*, 226 Kan. 70, 75, 596 P.2d 816 (1979). In

determining whether a joint venture exists under Kansas law, courts look at

five factors, which are not exclusive or outcome-determinative:

> (1) the joint ownership and control of property; (2) the sharing of
> expenses, profits, and losses, and having and exercising some voice in
> determining the division of net earnings; (3) a community of control
> over and active participation in the management and direction of the
> business enterprise; (4) the intention of the parties, express or
> implied; and (5) the fixing of salaries by joint agreement.

*Meyer v. Christie*, 634 F.3d 1152, 1158 (10th Cir. 2011) (quoting *Terra*

*Venture,* 443 F.3d at 1245). "When the relationship of joint adventurers

exists, the parties stand in a close relationship of trust and confidence and are bound by the same standards of good conduct and square dealing as are required of partners." *Terra Venture*, 443 F.3d at 1245 (internal quotation marks and citation omitted).

Penner is entitled to summary judgment on this joint venture claim as Salek has failed to come forth with specific facts from which a rational fact finder could find in his favor on this claim. Salek's arguments certainly create the untenable position of recognizing a joint venture between co-employees who share potential earn-out payments which are not closely tied to their individual performances. While they each owned a separate equitable interest in earn-out payments, they did not share ownership or control of the other's equitable interest. There is no general sharing of profits or losses related to this venture, for Watco was contractually obligated to make these payments pursuant to a contractual formula that did not depend on their efforts and did not involve risk on their part. While Salek points to their efforts at working for Reload's commercial success, this argument shows the inconsistency in Salek's theory as now the asserted joint venture expands beyond earn-out payments to include all of Reload's operations. The same can be said about the Salek's argument that they shared some semblance of control and management of Reload's operations by virtue of their employment agreements. What Salek is asserting as their joint venture, however, is obtaining earn-out payments,

51

and he makes no argument showing how they exercised control or

management over the enterprise to pay them. Even assuming that Salek

had defined a joint venture as including Reload's general profit operations,

the facts of record do not show that Salek and Penner possessed and

exercised such management and direction as to meet this factor. Neither the

terms of the parties' written agreements nor the testimony cited by the

plaintiff supports a finding that Salek and Penner intended to associate for

obtaining earn-out payments when the agreements established this

contractual right to payments without regard to their individual

performances or their ongoing employment with Reload. Finally, there is no

evidence that they decided on their salaries by agreement between

themselves. The defendant Penner is granted summary judgment on this

claim.

**COUNT FOUR Against Defendants Watco, Reload, Express and
Penner:  Breach of Contract.**

As laid out in the pretrial order, the plaintiff's different counts

and theories of recovery are replete with overlapping claims. For each

subsequent count, the court will address specifically only those claims new

to the count and incorporates by reference its prior rulings. One of the

claims distinct to this count is:

> Watco's CEO Rick Webb's oral promise to Plaintiff in late 2007 also
> formed a binding contract between Plaintiff and Defendants Watco,
> Reload, and Express that EBITDA from any new transloading facilities
> and/or greenfield locations would belong to Reload and would count
> towards the Agreement's earn out provision.

52

(Dk. 107, p. 17). Another claim is that the defendants Watco, Reload, Express and Penner breached § 7.03 of the SPA:

> Without obtaining Plaintiff's written consent, Defendants Watco, Reload, Express, and Penner altered and/or amended the Agreement's earn out provisions when they entered into the Earn-Out Agreement and the Bonus Agreement.

(Dk. 107, p. 18). As far as any other breach of contract claims arguably included within this count, the court incorporates its rulings on count one.

### Webb's Oral Promise

The defendants argue that regardless of what Webb said or what the plaintiff recalls being said, there was no contract formed at the time. For two months later, the parties entered into the SPA with this provision:

> This Agreement along with the Ancillary Agreements and the Schedules and Exhibits thereto, contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter. None of the parties shall be liable or bound to any other party in any manner by any representations, warranties or covenants relating to such subject matter except as specifically set forth herein or in the Ancillary Agreements or the Confidentiality Agreement.

(Dk. 129-1, p. 46). The defendants argue the parol evidence rule bars the plaintiff from proving terms different from those contained in the fully integrated SPA.

"[T]he parole evidence rule prevents a party to a written contract from attempting to vary its terms by relying on oral representations, be they characterized as negotiations or promises made in

discussions leading up to the agreement." *Bouton v. Byers*, 50 Kan. App. 2d 35, 46, 321 P.3d 780 (2014) (citing *Barbara Oil Co. v. Kansas Gas Supply Corp.*, 250 Kan. 438, 452, 827 P.2d 24 (1992)). When it comes to applying this rule, the Kansas courts have said:

> Moreover, "[n]o doctrine is better established or more frequently applied than the one that where parties have carried on negotiations, and have subsequently entered into an agreement in writing with respect to the subject matter covered by such negotiations, the written agreement constitutes the contract between them and determines their rights." *Arensman v. Kitch*, 160 Kan. 783, 789, 165 P.2d 441 (1946) . . . .

*In re Estate of McLeish*, 49 Kan. App. 2d 246, 255-256, 307 P.3d 221 (2013) (other citations omitted). "When a contract is complete, unambiguous, and free from uncertainty, parol evidence of prior or contemporaneous agreements or understandings tending to vary the terms of the contract evidence by the writing is inadmissible." *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 679-80, 829 P.2d 884 (1992) (citation omitted).

Without a plausible argument or legal authority to support his position, the plaintiff proposes that the SPA's integration clause is only partially integrated. In fact, the integration clause is quite complete, for it "supersede[s] all prior agreements and understanding relating to such [the contract's] subject matter." (Dk. 129-1, p. 46). The court does not understand how these terms are limiting in nature as to render the clause only partially integrated.

The plaintiff next submits that Webb's promise is a separate agreement or that Webb's promise is admissible as supplementary evidence of terms consistent with the SPA. The plaintiff again does not cite any evidence or come forward with any tenable arguments showing Webb's alleged promise to be consistent with the fully integrated SPA, to be supported by separate consideration, and to be an agreement that would naturally be made separate from the SPA based on the parties' situation. The court summarily rejects these arguments and applying the plain terms of the parol evidence rule grants summary judgment to the defendants on the plaintiff's count four breach of contract claim based on Webb's oral promise.

<u>Breach of § 7.03 of SPA</u>

The court incorporates by reference its discussion of this term from its ruling on count one. Because all of the defendants rely on the same arguments the court addressed before, their motions for summary judgment on this claim are denied. The court understands that the defendant Penner's challenges to damage causation may be unique, but his motion fails to show the lack of material questions of fact on this element of the claim. The plaintiff's damage theory remains viable on its face. Specifically, by entering the separate earn-out agreement without Salek's written consent, the defendant Penner changed the SPA's terms on the earn-out payments such that Salek may have lost his right to have that earn-payment equally divided

with him in April of 2011. The court has discussed above the material

questions of fact surrounding this payment.

**COUNT FIVE Against Defendant Penner:  Breach of Confidentiality and Non-Competition Agreement**

**COUNT SIX Against Defendant Penner:  Third-Party Beneficiary Enforcement of Non-Competition Agreement**

**COUNT SEVEN Against Defendant Penner:  Breach of Employment Agreement**

**COUNT EIGHT Against Defendant Penner:  Third-Party Beneficiary Enforcement of Employment Agreement**

In these claims, the plaintiff seeks to enforce different terms of

the employment agreement existing between the named parties, Penner and

Reload and Watco (Dk. 129-1, pp. 57-60) and the confidentiality and non-

competition agreement also existing between these named parties, Penner

and Reload and Watco (Dk. 129, pp. 62-66). Though not a party named in

either agreement, Salek argues he can enforce the agreements on two

alternative grounds:  first, both agreements are incorporated into SPA to

which Salek is a named party, and second, Salek is a third party beneficiary.

As reflected in the pretrial order, the parties agree the employment

agreements have a choice of law clause applying Missouri law. (Dk. 107, p.

2). The confidentiality and non-competition agreement contains a similar

clause. (Dk. 129, p. 65).

Penner seeks summary judgment arguing Salek lacks standing

to pursue any of these counts because he is not a party to these two

agreements and because the plaintiff is no more than an incidental third-party beneficiary who lacks standing to enforce these agreements. In the pretrial order, (Dk. 107, pp. 19-20, 22-23), Salek counters that the SPA expressly incorporates these agreements at § 1.03(b)(v), which provides:

> Chris L. Salek, Phillip A. Penner, and Companies shall enter into the Employment Agreements and Confidentiality and Non-Competition Agreements, as applicable, attached hereto as Exhibits E-1, E-2, E-3, and E-4 and incorporated herein by reference; . . . .

(Dk. 129-1, p. 7). In opposing summary judgment, Salek writes that Penner's arguments are "misleading" in not citing § 5.11 which Salek reads as fully incorporating the terms and conditions of these agreements into the SPA. (Dk. 128, p. 32). Penner certainly has not misled the court by relying on § 1.03 which was the provision that Salek cited in the pretrial order. For that matter, Penner has not misled the court in not first addressing § 5.11 which is a provision that Salek did not cite in the pretrial order. As Penner argues, the Salek cannot prevail under § 1.03 or § 5.11 which similarly reads:

> At Closing, Chris L. Salek and Phillip A. Penner will execute the Employment Agreements and Confidentiality and Non-Competition Agreements, as applicable, attached hereto as Exhibits E-1, E-2, E-3, and E-4 attached to this Agreement, the terms and conditions of which are incorporated into this Agreement by reference.

(Dk. 129-1, p. 34). The only notable distinction is that § 5.11 specifically mentions "the terms and conditions" as being incorporated.

To bring each of these four breach of contract counts, the plaintiff must be able to prove for each that he has standing to enforce the

agreements because he is either a party to the agreements or a third-party beneficiary to them. *Coverdell v. Countrywide Home Loans, Inc.*, 375 S.W.3d 874, 880-881 (Mo. App. S.D. 2012). Not named as a party in either of these agreements, Salek seeks to make himself a party by reason of the SPA's incorporation of them by reference. He argues these agreements "were essential" to the SPA, "because parties' efforts thereunder affect the remaining earn out payments" and, specifically, because "the parties' efforts and agreements not to compete would be necessary for Reload to achieve the numbers necessary for Plaintiff and Defendant to obtain earn out payments." (Dk. 128, p. 32).

Penner counters that the agreements are separate and distinct from the SPA addressing only the terms of Penner's employment with Reload without imposing any mutual obligations on Salek. Penner points out that the SPA does not fully incorporate the agreements in providing that the agreements are executed "as applicable" and meaning that the agreements as applicable respectively to Salek and to Penner. Because a set of agreements were separately executed for each Salek and Penner, it is clear that the parties did not intend the incorporation to mean Salek became a party to Penner's set of agreements, particularly when Salek had his own corresponding set of agreements specifically applicable to him.

Missouri law on interpreting contracts is as follows:

The interpretation of a contract is a question of law. *Wilshire Const. Co. v. Union Elec. Co.*, 463 S.W.2d 903, 905 (Mo. 1971). "The cardinal

> principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Dunn Indus. Group v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003). To determine the parties' intent, we read the agreement as a whole and give each term its plain, ordinary, and usual meaning. *Id*. We construe each term so as to avoid rendering other terms meaningless. *Id*. "A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Id*. If the language is not ambiguous, we determine the parties' intent from the contract alone. *Id*. at 428–29.

*Wilson Mfg. Co. v. Fusco*, 258 S.W.3d 841, 844 (Mo. App. E.D. 2008). When the terms are ambiguous, that is, "susceptible of more than one meaning so that reasonable persons may fairly and honestly differ in their construction of the terms," a court may look to matters outside the contract. *Livers Bronze, Inc. v. Turner Const. Co.*, 264 S.W.3d 638, 642 (Mo. App. W.D. 2008). "In Missouri, matters incorporated into a contract by reference are as much a part of the contract as if they had been set out in the contract in *haec verba*." *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 435 n.5 (Mo. banc 2003). Missouri law also recognizes that incorporation may be limited by purpose:

> One instrument may incorporate the whole or any designated part of another instrument. *Tillman v. City of Carthage*, 297 Mo. 74, 247 S.W. 992, 995 (1922). . . . When another instrument or designated part thereof is incorporated by reference, the original instrument and the incorporated matter must be construed together. *Tillman*, 247 S.W. at 995. But, if "'the reference to another writing is made for a particular and specified purpose, such other writing becomes a part of the contract for such specified purpose only.'" *Id*. (quoting 13 C.J. 530 section 488). "A reference by the contracting parties to an extraneous contract for a particular purpose makes it a part of their agreement only for the purpose specified." *Guerini Stone Co. v. P.J. Carlin Constr. Co.*, 240 U.S. 264, 277, 36 S.Ct. 300, 60 L.Ed. 636 (1916). See also 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of*

*Contracts* section 30:25 (4th ed.1999); 17A C.J.S. *Contracts* section 316 (1999); 17A Am.Jur.2d *Contracts* section 400 (1991).

*Wilson Mfg.*, 258 S.W.3d at 845.

The issue here is whether the SPA's incorporation clauses reveal the parties' intent that Salek would become a party to Penner's individual set of the employment agreement and the confidentiality and non-competition agreement. There are no arguments over ambiguities or attempts to offer extrinsic evidence. On the face of the clause, the incorporation by general is such that it is as if these agreements and their terms and conditions were set out in the SPA in *haec verba.* But, the plaintiff Salek would have the court equate incorporation with the writing in of his name to these specific contract terms between Penner and Reload/Watco when Salek has his own set of specific contracts with the same or similar terms with Reload/Watco. If the parties had intended Salek and Penner to become parties to the other's separate set of agreements by incorporation, the purpose or reason for separate contracts seems lost or rendered meaningless. Looking for a reasonable meaning that preserves the parties' reason and purpose for separate agreements, the court interprets the incorporation clause as meaning that the separate agreements, "as applicable," to Salek and Penner respectively were executed and incorporated into the SPA. This reading preserves the parties' intent to incorporate fuller expressions of duties and obligations referenced in the SPA without creating duties or obligations between Salek and Penner which the SPA does not include, identify, or

reference. Each set of separate agreements speak to the specific duties/obligations existing between Reload/Watco and either Penner or Salek. While these agreements are part of the same transaction, this is not enough for this court to strain the plain terms of the incorporation clause and write Salek into Penner's separate set of agreements. And it is not as if the SPA did not contemplate and provide for motivating Salek's and Penner's efforts at working for Reload's success, for the earn-out provision provided they would share them. The court grants summary judgment for Penner on counts five and seven.

The plaintiff's alternative third-party beneficiary theory is equally unavailing. He argues the employment agreement in referencing "continued employment" under the SPA is acknowledging an "intent to benefit the parties" to the SPA which includes the plaintiff. (Dk. 128, p. 35). The plaintiff also singles out from the confidentiality and non-competition agreement a provision that states the agreement "is being provided as a condition of . . . [the SPA] entered into between myself, Reload, Watco and Chris L. Salek contemporaneously herewith . . . ." (Dk. 129-1, p. 62).

The following establishes the Missouri law relevant to this issue: A third-party beneficiary is one who is not privy to a contract but may nonetheless pursue a cause of action for breach of contract. *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Center Co., L.P.*, 75 S.W.3d 247, 260 (Mo. banc 2002). The rights of a third-party beneficiary depend on the terms of the contract itself. *Id*. The beneficiary need not be named in the contract, but the terms of the agreement must clearly and directly express an intent to benefit an identifiable person or class. *Id*. A party claiming rights as a third-party beneficiary has the burden of showing that provisions in the contract were intended for his direct

benefit. *Federal Deposit Ins. Corp. v. G. III Investments, Ltd.*, 761 S.W.2d 201, 204 (Mo.App.1988). The contract rights are only enforceable if the promisor assumed a direct obligation to the third-party beneficiary. *Id.*

There are three types of third-party beneficiaries: donee, creditor, and incidental. *Id.* Donee and creditor beneficiaries may maintain actions and recover under a contract, while incidental beneficiaries may not. *L.A.C.*, 75 S.W.3d at 260.

A donee third-party beneficiary exists when "the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed nor asserted to be due from the promisee to the beneficiary." *Id.* A creditor beneficiary is "one upon whom the promisee intends to confer the benefit of the performance of the promisee's contract with the promisor and thereby discharge an obligation or duty the promisee owes the beneficiary." *Federal Deposit Ins. Corp.*, 761 S.W.2d at 204. In contrast, an incidental beneficiary is one who will benefit from the performance of a promise but who is neither a promisee nor an intended beneficiary. *OFW Corp. v. City of Columbia*, 893 S.W.2d 876, 879 (Mo.App.1995).

*Kansas City Hispanic Ass'n Contractors Enterprise, Inc. v. City of Kansas City*, 279 S.W.3d 551, 555 (Mo. App. W.D. 2009).

Though the defendant Penner's memorandum (Dk. 120, pp. 19-20) made him aware of Missouri law on third-party beneficiaries, the plaintiff's response does not come forward with any arguments or evidence to show he qualifies as either a donee or creditor third-party beneficiary. Salek is not a creditor beneficiary, as Penner's performance would not discharge any obligation that Reload/Watco owed Salek. Salek is not a donee beneficiary, because the purpose of these agreements was not to make a gift nor confer a right on Salek. Instead, the agreements plainly were intended to establish only the terms and conditions of Penner's employment

and his duties of confidentiality/non-competition to Reload. The provisions cited by the plaintiff do not show that Salek was intended to benefit directly from restrictions on Penner's employment or from sharing information or business with competitors. In sum, Salek is unable to prove that the terms of the Penner's employment agreement and confidentiality and non-competition agreement clearly and directly express an intent to benefit Salek. Penner is granted summary judgment on counts six and eight.

**COUNT NINE Against Defendants Watco and Reload:  Breach of Employment Agreement**

Salek alleges the defendants breached his employment agreement which gave him "significant input over all aspects of operations of" Reload when it took the following actions "without obtaining any input from" him. (Dk. 129-1, p. 68). These decisions are set forth in the pretrial order. (Dk. 107, p. 24). The first is the decision to provide Reload's key executives and pay their salaries and expense for work on the EOG crude oil project and then to not keep the earnings from that work but permit them be moved to WTL. The other decisions are to have WTL take over the Reload crude oil facilities at Stroud, Oklahoma, and Stanley, North Dakota. (Dk. 107, p. 24).

The defendants seek summary judgment arguing that the EOG crude oil project was not part of Reload and that Salek's employment agreement did not give him the right of input on Watco's decision to engage in other business opportunities outside of Reload. The defendants argue that

WTL is a separate entity from Reload and that WTL, not Reload, contracted with EOG Resources for this project. The defendants challenge that the plaintiff has no proof of causation or damages on this claim.

The plaintiff cites deposition testimony evidencing that Reload was involved in the early stages of the EOG Project, that Reload's expertise and experience was used in planning and developing it, that Penner and other employees with Reload worked on the EOG Project and their salaries were paid by Reload. Employees with Reload were used in securing the property and in preparing the transloading facilities and sites. Being denied input, Salek argues he never would have agreed that the earnings from the EOG Project should go to WTL after Reload employees had done all this work on the EOG Project. Salek argues the employment agreement was breached when Watco's executives negotiated a separate deal for Penner to receive an earn-out payment based on his EOG Project work. As for damages, Salek again points to his lost earn-out payment because he "would not have allowed Defendants to divert revenues from Reload into another company." (Dk. 147, p. 61).

The analysis begins with § 2 of Salek's employment agree which provides:

> This agreement ("Agreement" is entered into this 4th day of January, 2008 by and between Chris L. Salek ("Employee"), Reload, Inc., a Missouri Corporation ("RELOAD" or "Employer"), and Watco Mechanical Corp., a Kansas corporation ("Watco"), parent company to RELOAD, (herein "Employer") and relates to the continued employment of Employee by Employer pursuant to the Stock Purchase Agreement

between the parties as of this date, January 4, 2008 ("Stock Purchase Agreement").

**1. Employment.** Employer agrees to continue to employ Employee, and Employee agrees to continue his employment, on the terms and conditions set forth in this Agreement. For the avoidance of doubt, Employee shall be employed by RELOAD and not Watco. Watco merely joins in the Agreement for the purpose of causing RELOAD to satisfy the obligations of the Stock Purchase Agreement and this Agreement.

**2. Duties**. The Employee assumes the principal duties and responsibilities as VP of Sales and Marketing, which include, but are not to be limited to, overseeing the daily marketing and growing the revenue and business of RELOAD, and such other duties and responsibilities as may be reasonably assigned by Kevin Goins, VP of Distribution Services, or such other designee of RELOAD. Even though Employee's main focus will be the daily marketing and revenue/sales growth for RELOAD's services, <u>Employer agrees that Employee will have significant input over all aspects of operations of RELOAD, including location, spending and personnel</u>.

(Dk. 129-1, p. 68) (underlining added). As written, the contract obligated Reload to give Salek "significant input over all aspects of" Reload's operations. This provision cannot be fairly read as obligating the parent corporation Watco to give Salek input into Watco's decisions on where to locate new subsidiary business. The plaintiff has not come forward with any evidence showing that the decision to put the EOG Project and its revenue under WTL was made by Reload as part of its operations. He does not point to any agreements, other corporate document, or deposition testimony evidencing that the eventual location of the EOG Project and its revenue was even a decision for Reload to make. Even assuming for the sake of argument that Reload may have had a voice in the making of that decision, the plaintiff's evidence of causation would remain too speculative for an actionable claim.

The uncontroverted facts are that WTL eventually entered into the EOG Project contract receiving the proceeds from this business transaction and that Reload employees did work on the EOG Project. There is no question but that the use of Reload employees and resources falls within Reload's operations about which Salek was entitled under the agreement to have significant input. It is a different matter, however, to conclude that the use of Reload's employees necessarily brings the entire project under Reload's "operations." As far as a claim based on the failure to give Salek input over the use of Reload's employees, resources and facilities in the EOG Project, the defendants are entitled to summary judgment on such a claim, as the plaintiff has not articulated or attempted a prove causation and damages theory according with this claim. The plaintiff offers no evidence establishing a causal link between his input and a different outcome and the loss he then sustained. The defendants are granted summary judgment on this count.

**COUNT TEN Against Defendant WTL:  Tortious Interference with SPA**

In the pretrial order, the plaintiff alleges the following:

4. Defendant Transloading was intentionally created by Defendant Watco's key executives to take the EOG crude oil projects away from Reload and prevent Plaintiff from receiving any earn out payments.
5. Defendant Transloading intentionally siphoned the earnings away from Reload that were derived from transloading EOG's crude oil at the Stanley and Stroud facilities.
6. Defendant Transloading intentionally entered into the secret Earn-Out Agreement and the secret Bonus Agreement to prevent Plaintiff from receiving any earn out payments.
7. Through these actions, Defendant Transloading intentionally

> brought about the breach of the Agreement.
> 8. These actions by Defendant Transloading were without justification,
> and were maliciously directed at economically harming Plaintiff
> because Defendant Watco desired to fire Plaintiff but Penner refused to
> testify against Plaintiff when asked to do so by Watco's CEO and
> Watco's President.

(Dk. 107, p. 25). The parties agree that Kansas law governs this issue. "The

elements of tortious interference with a contract are: (1) the contract; (2)

the wrongdoer's knowledge thereof; (3) his intentional procurement of its

breach; (4) the absence of justification; and (5) damages resulting

therefrom." *Cohen v. Battaglia*, 296 Kan. 542, 546, 293 P.3d 752 (2013)

(citing *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 423, 77 P.3d 130

(2003)). Such a claim "is predicated upon malicious conduct by the

defendant." *Burcham*, 276 Kan. at 425 (citation omitted). The defendant's

motive and the maliciousness of its conduct are generally questions for the

jury. *Id.* A third party cannot have interfered with a contract by procuring or

inducing a breach unless a party to the contract is in breach of the contract.

*Wolfe Elec., Inc. v. Duckworth*, 293 Kan. 375, 391, 393, 266 P.3d 516

(2011).

        It appears the plaintiff is alleging that WTL wrongfully induced

Watco to breach the SPA's earn-out provision with Salek by doing the

following. WTL allowed itself to be created as a wholly-owned subsidiary of

Watco. WTL allowed itself to contract for the EOG Project pursuant to the

directions of Watco's officers. Frankly, the plaintiff offers no evidence of

WTL's malicious conduct on the facts of this case. What WTL did here does

not deserve the label of wrongdoing, and it certainly did not procure Watco's breach of the SPA. Rather, the plaintiff's evidence is that Watco's own officers were behind causing WTL to contract with EOG Resources in an effort by the officers to keep that revenue from Reload and to prevent earn-out payments to Salek. The court does not know how the plaintiff believes the evidence of this record matches up with the required elements for this claim particularly after incorporating the above summary judgment rulings on the plaintiff's breach of contract claims.

Even assuming otherwise, the court would conclude that WTL was justified here in that a parent corporation and its wholly-owned subsidiary "have a complete unity of interest" such that the agents of one, acting within the employment and benefit of their corporation "cannot be held liable on a tortious interference theory for inducing" the other "to breach a contract with a third party." *MGP Ingredients, Inc. v. Mars Inc.*, 465 F. Supp. 2d 1109, 1113-1114 (D. Kan. 2006) (Parent corporation cannot be liable for tortious interference with a contract between a wholly-owned subsidiary and a third party).[2] Because the holding and rationale in

_____

[2] "'[C]ourts across the country [have held] that a parent corporation has a privilege to interfere with the contracts of its wholly-owned subsidiary when the contract threatens a present economic interest of that subsidiary, absent clear evidence that the parent employed wrongful means or acted with an improper purpose.' *Truckstop.Net, L.L.C. v. Sprint Commc'ns Co.*, 537 F.Supp.2d 1126, 1140 (D.Idaho 2008) (citing cases); *see also MGP Ingredients, Inc. v. Mars, Inc.*, 465 F.Supp.2d 1109, 1114 (D.Kan.2006) (citing cases)." *JPMorgan Chase Bank, N.A. v. KB Home*, 632 F. Supp. 2d 1013, 1027-1028 (D. Nev. 2009).

*MGP Ingredients* is based on the nature of the relationship and unity of

interests between a parent corporation and its wholly-owned subsidiary, the

court concludes that it necessarily encompasses the situation here. The

plaintiff cannot come within the exception to this rule, for again he cannot

prove that the alleged wrongdoer WTL, not Watco, employed wrongful

means or acted for an improper purpose in contracting with EOG Resources.

*See MGP Ingredients*, 465 F. Supp. 2d at 1114. The court grants summary

judgment for WTL on this count.

**COUNT ELEVEN Against Defendant WTL:  Tortious Interference with
Prospective Business Advantage**

In the pretrial order, the plaintiff alleges the following:

> 1. Plaintiff had a business relationship and expectancy that he would receive earn out payments based on the earnings Reload would derive from transloading crude oil for EOG.
> 2. Defendant Transloading had knowledge of Plaintiff's business relationship and expectancy.
> 3. Defendant Transloading was intentionally created by Defendant Watco's key executives to take the EOG crude oil project away from Reload to prevent Plaintiff from receiving any earn out payments.
> 4. But for the conduct by Defendant Transloading, Plaintiff was reasonably certain to have continued the relationship and realized his expectancy to receive earn out payments based on the earnings Reload would derive from transloading crude oil for EOG.

(Dk. 107, p. 26). Both parties apply Kansas law to this claim and the

following elements for tortious interference with a prospective business

advantage or relationship:

> (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff;  (2) knowledge of the relationship or expectancy by the defendant;  (3) a reasonable certainty that, except for the conduct of the defendant, plaintiff would

69

have continued the relationship or realized the expectancy;  (4)
intentional misconduct by defendant; and (5) incurrence of damages
by plaintiff as a direct or proximate result of defendant's misconduct.
Burcham, 276 Kan. 393, Syl. ¶ 15, 77 P.3d 130.

*Cohen v. Battaglia*  296 Kan. at 546.

Much of what the court had to say about count ten applies here

too. The plaintiff's alleged business expectancy is receiving earn-out

payments based on Reload's work for EOG. It appears the plaintiff is

claiming that WTL intentionally contracted with EOG Resources in order to

interfere with the plaintiff's right to receive earn-out payments based on

Reload's EBITDA. As discussed in count ten, the plaintiff offers no evidence

of WTL's malicious conduct on the facts of this case. Simply put, the plaintiff

has no evidence of WTL being a wrongdoer or interfering with plaintiff's right

to earn-out payments. Created by Watco as its wholly-owned subsidiary,

WTL acted as directed in contracting with EOG Resources. There is no

evidence of intentional wrongdoing on the part of WTL. For that matter, the

plaintiff offers nothing but his speculation on elements three and five. If WTL

had not contracted with EOG Resources, there is nothing but the plaintiff's

own speculation that this revenue would have been earned by Reload rather

than some other entity created by Watco's officers. The defendant WTL is

granted summary judgment on count eleven.

IT IS THEREFORE ORDERED that the plaintiff Chris Salek's

motion for summary judgment (Dk. 116) is denied;

IT IS FURTHER ORDERED that the defendant Phillip Penner's

motion for summary judgment (Dk. 119) is granted as to counts three, five, six, seven and eight, and denied as to count four;

IT IS FURTHER ORDERED that the motion for summary judgment (Dk. 121) filed by the defendants, Watco Mechanical Corp.; Watco Transloading LLC; Reload, Inc.; and Reload Express, Inc. is granted in part and denied in part on counts one, two, and four, and is granted on counts nine, ten and eleven.

Dated this 30th day of September, 2014, Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge